1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JESUS VALDEZ RUIZ,                                1:12-CV-00619 LJO BAM HC

                    Petitioner,

                                                  FINDINGS AND RECOMMENDATION
         v.                                       REGARDING PETITION FOR WRIT OF
                                                  HABEAS CORPUS

RON BARNES, Warden,

                    Respondent.
_____/

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

                        **PROCEDURAL BACKGROUND**[1]

        Petitioner is currently in the custody of the California Department of Corrections and

Rehabilitation pursuant to a judgment of the Superior Court of California, County of Tulare,

following his conviction by jury trial on August 27, 2010, of first degree murder (Cal. Penal

Code § 187) with personal and intentional discharge of a firearm (Cal. Penal Code

§ 12022.53(d)).

        Petitioner timely filed a notice of appeal.  On December 21, 2010, the California Court of

Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

decision.  (Resp't's Answer, Ex. A.)  Petitioner then filed a petition for review in the California

---

[1]This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

1   Supreme Court.  On April 13, 2011, the petition was summarily denied.  (Lodged Docs., <u>Order</u>

2   <u>Denying Pet. for Review</u>.)

3        On March 23, 2012, Petitioner filed the instant federal habeas petition in this Court.  The

4   petition presents the following grounds for relief: 1) The trial court committed prejudicial error

5   when it prevented Petitioner from impeaching Charles Jimenez with out-of-court statements

6   contradicting his incriminating statements; 2) The trial court erred when it told jurors that Paul

7   Olmos was an accomplice as a matter of law; 3) The trial court erred when it refused to tell jurors

8   that they should not consider Olmos' guilty plea as evidence against Petitioner; 4) The trial court

9   committed prejudicial error when it admitted evidence that Petitioner was a gang member; 5) The

10  trial court committed prejudicial error when it admitted Michael Chavez' taped statement to

11  police; and 6) The trial was rendered fundamentally unfair by cumulative error.  On October 3,

12  2012, Respondent filed an answer to the petition.  Petitioner did not file a traverse.

**STATEMENT OF FACTS**[2]

14       The Fifth DCA summarized the facts of the case, as follows:

15       Early in the morning on November 18, 2006, a police officer found Nathan
16  Buford lying nonresponsive on the shoulder of a road in Porterville, bleeding from a head
    wound.  He died five days later.  The cause of death was a single gunshot wound to the
17  head with a trajectory from back to front.  A jury found Jesus Valdez Ruiz guilty of his
    murder.

18  (Resp't's Answer, Ex. A.)  The facts were discussed in greater detail in the appellate court's

19  analysis of each claim and will be set forth with respect to each claim below.

**DISCUSSION**

21  I.   <u>Jurisdiction</u>

22       Relief by way of a petition for writ of habeas corpus extends to a person in custody

23  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

24  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

25  529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

27      [2]The Fifth DCA's summary of the facts in its December 21, 2010, opinion is presumed correct. 28 U.S.C.
28  §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
    adopts the factual recitations set forth by the Fifth DCA.

guaranteed by the U.S. Constitution.  The challenged conviction arises out of Tulare County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists

1   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

2   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

3   correctness of the state court's decision, the decision cannot be considered unreasonable.  Id.  If

4   the Court determines that the state court decision is objectively unreasonable, and the error is not

5   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

6   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

7       Petitioner has the burden of establishing that the decision of the state court is contrary to

8   or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

9   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

10  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

11  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

12  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

13      AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1)

14  is limited to the record that was before the state court that adjudicated the claim on the merits,"

15  and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

16  Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

17  courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

18  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

19  factual finding is not entitled to deference if the relevant state court record is unavailable for the

20  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

21  Tamayo-Reyes, 504 U.S. 1 (1992).

22  II.    Review of Claims

23          A.  Exclusion of Charles Jimenez's Statements

24      Petitioner first alleges the trial court erred by preventing Petitioner from impeaching

25  witness Charles Jimenez with his out-of-court statements.

26      This claim was presented on direct appeal to the Fifth DCA.  The Fifth DCA denied the

27  claim in a reasoned decision. (Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

28  California Supreme Court in a petition for review.  The California Supreme Court denied the

claim without comment or citation of authority.  (Lodged Docs., <u>Order Denying Pet. for Review</u>.)

When the California Supreme Court's opinion is summary in nature, the Court must "look

through" that decision to a court below that has issued a reasoned opinion.  <u>Ylst v. Nunnemaker</u>,

501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the

claim as follows:

> Ruiz argues that the court's ruling denying his request to impeach a witness's incriminatory statement was a prejudicial violation of his federal constitutional right to confrontation. The Attorney General argues that Ruiz's argument on appeal is outside the scope of his offer of proof at trial, that he forfeited his right to raise a federal constitutional issue on appeal by failing to articulate a federal constitutional objection at trial, and that confrontation clause error, if any, was harmless.

> At the preliminary hearing, Rudy Jimenez testified he told Detective Sonia Silva that his brother Charles Jimenez said in a panic and in "shell shock" that Ruiz had shot Buford. Silva testified her investigation showed that Charles heard the bang and saw Buford slump and that "a lot of blood and brain matter" was "everywhere" in Buford's car.

> Shortly before the swearing of the jury, the court held an evidentiary hearing to determine whether Rudy's statement fell within the spontaneous statement exception to the hearsay rule. (Evid.Code, §§ 402, 1240.) Silva, the investigating officer and the sole witness at the hearing, testified that Charles, Ruiz, Buford, and Paul Olmos left Rudy's house on the night of the shooting and that Charles came back later-terrified, in "shell shock," and almost in a panic-and said Ruiz had shot Buford. Silva had not heard of a statement that defense counsel said Charles made to a district attorney's investigator about never having seen Ruiz or anyone else with a gun. The court noted Charles had a motive to deny everything once he had time for reflection after he told Rudy about the shooting. Silva opined on the basis of her investigation that Rudy's statement, like the witness statements putting Charles in the car at the time of the shooting, were true. The court took judicial notice of Rudy's preliminary hearing testimony and ruled his statement admissible "within the purview of Evidence Code Section 1240." No mention was made at the hearing of Evidence Code section 1202, the statute governing the admissibility of evidence relevant to the credibility of a hearsay declarant.

> At trial, Olmos and Rudy, both of whom considered Buford a friend, testified about his death. Olmos testified that he and Buford left together in Buford's car on the night of the shooting. Buford stopped and picked up Charles, Ruiz, and a person Olmos had never seen. Charles is big, so Olmos got out of the front seat to let him sit there, and Olmos got into the back seat, with Ruiz on his left behind Buford and the stranger on his right behind Charles. As soon as the last person got in, Olmos saw something black and shiny on his left, where Ruiz was sitting, and then he saw a flash, and he heard a shot, and he heard Buford moan.

> As soon as the shot was fired, everyone jumped out of the car. Ruiz and the stranger took off right away. Olmos checked on Buford, who made sounds as if he had just been knocked out. Not knowing how serious his injury was, Olmos kept saying, "Wake up," but Charles kept saying, "Let's go." The two of them ran to Rudy's house, where Olmos told Rudy that Ruiz had shot Buford in the back of the head. Afterward Charles told Rudy the same thing.

Not wanting to leave Buford behind, Olmos caught a ride back to the scene of the shooting, where he found him slumped over inside the car. Olmos pulled him out of the car, tried to wake him up again, but got no response and, confused and scared, thinking he was dead, left him beside the road and drove off in his car, which he soon ditched. He did not cooperate with the police at first, since telling the police his friend "got shot in the back of the head" by someone he knew was putting his life in jeopardy, but later he pled guilty to accessory after the fact and agreed to testify.

Rudy testified at trial that after Charles, Ruiz, Buford, and Olmos left his house on the night of the shooting Charles came back "scared and shocked" and said Ruiz had shot Buford. Silva interviewed Rudy after the shooting. She told him her investigation placed Charles in Buford's car at the time of the shooting. He told her Charles said Ruiz had shot Buford.

Michael Chavez, who grew up with Ruiz and met Buford in prison, testified at trial that about a month after Buford's death he received a phone call from Ruiz saying, "That he did it." Having known Ruiz for 16 years, Chavez was familiar with his voice. He acknowledged telling detectives in an interview that Ruiz said in a phone call " 'that he killed, he killed Nathan Buford.' " Additionally, Chavez testified Olmos told him that Ruiz killed Buford and that after Olmos left the scene of the shooting he returned later and pulled Buford out of the car to see if he was dead or alive. Olmos told Chavez he was sure Buford was dead. "I'll eventually die," Chavez testified, fearing for his safety after talking to the police and testifying in court.

After Rudy, Olmos, and Chavez testified, the court noted for the record that Charles was not available to testify at trial. The court observed that "both sides had an opportunity to find [him] and he's gone" and that "unless [his] statements qualify as an admission, a declaration against penal interest for some reason, prior recorded testimony, it's hearsay as to Charles." The prosecutor added, "I don't see any exception to letting hearsay statements in just because Charles Jimenez is not available and present at trial."

After the jury found Ruiz guilty, the court granted his attorney's motion for leave to withdraw and appointed the public defender to represent him. The public defender filed a new trial motion citing, inter alia, Evidence Code section 1202 and arguing, inter alia, that the denial of Ruiz's request to impeach Charles's out-of-court statement with inconsistent statements in the police report prejudiced him. The prosecutor filed an opposition. The court denied the motion.

On appeal, Ruiz argues that Evidence Code section 1202 permitted the requested impeachment, which would have allowed the jurors to hear statements Charles made to a district attorney's investigator that four people were in the car at the time of the shooting, that when he heard the shot he bailed out of the car and saw nothing, that he told Rudy Nathan was dead and he did not know what happened, that he never told Silva he saw Ruiz or anyone else with a gun, and that he did not see Ruiz take out a handgun and shoot Buford in the back of the head. The record shows Charles made those statements to the district attorney's investigator on October 11, 2007.

In the interest of judicial efficiency, we assume, without deciding, that Ruiz's argument on appeal is within the scope of his offer of proof at trial, that he articulated a federal constitutional objection at trial, and that the court's ruling was a violation of his federal constitutional right to confrontation. The sole issue still before us, then, is whether he was prejudiced.

The United States Supreme Court emphasizes that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation

Clause errors, is subject to *Chapman* harmless-error analysis" and that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680-681, 684, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman* ).)

Our review of the record satisfies us beyond a reasonable doubt that there was no prejudice. As the court sagely observed at the evidentiary hearing, Charles had a motive to deny everything once he had time for reflection after he told Rudy about the shooting. Just like Olmos, who testified that telling the police about Ruiz shooting Buford was putting his life in jeopardy, Charles understandably equivocated, obfuscated, and prevaricated. His spontaneous statement to Rudy on the night of the shooting was cumulative to, and less damning than, Olmos's and Chavez's testimony about Ruiz's commission and admission, respectively, of Buford's murder. The ruling did not deny Ruiz a fair trial.

(Resp't's Answer, Ex. A (footnotes omitted).)

Respondent argues first that Petitioner has failed to make out a federal claim because Petitioner has not specified a federal constitutional right that was violated. However, liberally construing the claim, it is apparent that Petitioner's claim is based on a violation of the Confrontation Clause, insofar as Petitioner complains he was not allowed to impeach the witness with out-of-court statements.

The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right extends to defendants in state as well as federal criminal proceedings. <u>Pointer v. Texas</u>, 380 U.S. 400 (1965). In <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004)*,* the United States Supreme Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the accused had "a prior opportunity for cross-examination." The <u>Crawford</u> holding abrogated, in part, the prior rule that the admission of testimonial hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell under a "firmly rooted hearsay exception" or otherwise bore indicia of reliability. <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980). "Although <u>Crawford</u> did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" <u>Delgadillo v.</u>

Woodford, 527 F.3d 919, 927 (9th Cir. 2008), *quoting* Crawford, 541 U.S. at 51 (first alteration in original) (internal quotation marks omitted).  Later, in Michigan v. Bryant, 562 U.S. __, __, 131 S.Ct. 1143, 1155 (2011), the Supreme Court determined that a statement is testimonial if made "with a primary purpose of creating an out-of-court substitute for trial testimony."

In essence, Petitioner claims the trial court erred by failing to permit him the right to impeach the out-of-court excited utterance by Charles Jiminez that Petitioner had shot the victim with a later statement that Charles had made after he had time to reflect on the consequences of identifying the murder suspect.  As Respondent correctly argues, the out-of-court excited utterance was not testimonial in nature.  After witnessing the murder, Charles Jiminez ran immediately to his brother's house and told him what had just occurred.  (CT[3] 91.)  Charles' brother stated that when Charles returned, he was "in a panic and in 'shell shock' that [Petitioner] had shot Buford." (CT 40, 91.)  The utterance was not a formal statement to law enforcement, a solemn declaration, or made with a primary purpose of creating an out-of-court substitute for trial testimony.  Rather, it was completely spontaneous and made under the extreme distress of having witnessed a murder.  The statement was therefore nontestimonial.  As such, Petitioner had no right under the Confrontation Clause to "confront" the excited utterance by Charles.

In addition, the state court reasonably determined that Petitioner was not prejudiced by the trial court's decision to disallow Charles Jiminez's later statement, since the later statement would have had no effect on the credibility of the excited utterance.  Defense counsel sought to introduce a statement Charles had allegedly made to an investigator almost a year after the incident to the effect that he had not seen Petitioner with a gun and had not seen who shot the victim.  (CT 1253-1254.)  The state court reasonably determined the statement was not credible given the fears Charles expressed for his life and his family and the amount of time Charles had to consider the consequences of testifying against an active gang-member.  When Charles was informed by investigators that they had obtained a subpoena fo r him, he advised them that he feared for his life because he had heard rumors on the street that there would be reprisals against

---

[3]"CT" refers to the Clerk's Transcript on Appeal.

those found "ratting" on suspects. (CT 649.)  He stated he felt threatened because he was being considered a "snitch[]" by others on the street. (CT 651.)  He stated he feared "they're gonna kill me." (CT 652.)  When asked about the shooting, he admitted he was in the car when it occurred. (CT 662-665.)  He stated he had been sitting in the front passenger seat, the victim was driving, Paul Olmos was sitting directly behind him, and Petitioner was sitting behind the victim. (CT 660.)  He admitted he heard the shot and that it had been fired from the back seat. (CT 662.)  He stated he went to his brother's house, but contrary to his prior statements, he stated he told his brother that he didn't know what had happened but the victim was dead. (CT 663.)  He then denied what his brother stated he had told him, which was that he had in fact seen Petitioner with a gun and that Petitioner had shot the victim. (CT 664.)  He conceded he had also told the Porterville Police Department that he had seen Petitioner take out a handgun and shoot the victim. (CT 672-673.)  In any case, he stated he believed Petitioner had shot the victim. (CT 667.)  When questioned about the new twist in his statement, Charles admitted that Petitioner had his "own people" and "probably has people looking . . . for us." (CT 670.)  He further stated he was worried that Petitioner might "threaten[] his family." (CT 670.)  Regardless, he agreed that despite his changed statement, he was confident Petitioner had fired the shot. (CT 673.)  He offered no explanation as to how he arrived at this conclusion based on anything other than having observed Petitioner shoot the victim.  Therefore, regardless of whether or not he had seen Petitioner with a gun in his hand, it was clear that he had personally observed Petitioner shoot the victim.

Had defense counsel been allowed to present the statement Charles had made that he had not seen Petitioner with a gun, doubtless the prosecutor would have then introduced all of the related portions of the statement as well. See Cal. Evid. Code § 356 (where part of a conversation or declaration is introduced, the whole may be inquired into by an adverse party).  Therefore, all of Charles' fears of testifying would have been introduced as well as the context of his changed statement.  Further, the prosecutor would have been able to introduce Charles' statements to the Porterville Police Department that he had seen Petitioner pull out a gun and shoot the victim as prior consistent statements. See Cal. Evid. Code § 791 (prior consistent statement admissible

1    when offered to contest admission of an inconsistent statement made after consistent statement).

2        Therefore, even if defense counsel would have been permitted to introduce the later

3    inconsistent statement of Charles, the totality of the evidence would have made it abundantly

4    clear that the inconsistent statement was made as a result of Charles' fears for his and his

5    family's safety after he had substantial time to reflect and consider the dangerous consequences

6    of his statements.  The inconsistent statement would have been deemed untrustworthy and not

7    credible as compared to Charles' excited utterance made immediately after the incident and his

8    statement to the Porterville police soon after the incident.  Since the statement would have had

9    little or no credibility, the state court's determination that its exclusion was harmless beyond a

10   reasonable doubt was not unreasonable.  Further, Petitioner cannot show that the exclusion of the

11   statement had a "substantial and injurious effect or influence in determining the jury's verdict."

12   Brecht, 507 U.S. at 637. The claim should be denied.

13       B.  Accomplice Instruction

14       Petitioner next claims the trial court erred when it instructed the jury that Paul Olmos was

15   an accomplice as a matter of law.

16       This claim was also presented on direct appeal to the Fifth DCA where it was denied in a

17   reasoned decision. (Resp't's Answer, Ex. A.)  It was then raised before the California Supreme

18   Court where it was summarily denied.  (Lodged Docs., Order Denying Pet. for Review.)

19   Accordingly, the Court must "look through" to the decision of the Fifth DCA.  Ylst, 501 U.S. at

20   804-05 & n. 3.  In rejecting the claim, the Fifth DCA stated:

21       Ruiz argues that the instruction defining as an accomplice the person whom the
         defense theory of the case portrayed as the lone shooter was a prejudicial violation of his
22       federal constitutional right to due process. Alternatively, he argues ineffective assistance
         of counsel if his attorney invited error by "proposing similar instructions and agreeing to
23       the instructions as given." The Attorney General argues error, if any, was invited and
         error, if any, was harmless.

24
         Shortly before trial commenced, Ruiz submitted five proposed instructions on
25       accomplices. The first, CALJIC No. 3.10, defined an accomplice as "a person who
         [is][was] subject to prosecution for the identical offense charged ... against the defendant
26       on trial by reason of [aiding and abetting] [or] [being a member of a criminal
         conspiracy]." The second, CALJIC No. 3.11, required that "[the testimony of an
27       accomplice]" be "corroborated by other evidence which tends to connect [the] ...
         defendant with the commission of the offense." The third, CALJIC No. 3.12, instructed
28       on "sufficiency of evidence to corroborate an accomplice." The fourth, CALJIC No. 3.13,

instructed that "one accomplice may not corroborate another." The fifth, CALJIC No. 3.16, instructed that "if the crime of-was committed by anyone, the witness-was an accomplice as a matter of law and [his][her] testimony is subject to the rule requiring corroboration."

At the instruction settling conference, the court considered the prosecutor's proposed instructions first. "Now we have the instruction of [CALCRIM No.] 335 which is the accomplice testimony of Paul Olmos," the court stated. "And they're conceding that he was an accomplice," to which the prosecutor replied, "Right." Asked if there was a defense objection, Ruiz's attorney replied, "No. No objection." Acknowledging Ruiz's attorney "requested a lot of instructions on this issue," the court noted CALCRIM No. 335 required viewing "accomplice testimony with caution," to which Ruiz's attorney replied, "Okay." On that record, the court instructed the jury with CALCRIM No. 335 ("Accomplice Testimony: No Dispute Whether Witness Is Accomplice").

Before considering the merits of Ruiz's argument, we address the Attorney General's invited error argument. Since Ruiz's attorney requested "substantially the same instructions as were given," the Attorney General claims the necessary "showing of a tactical purpose" is in the record. "'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.'" (*People v. Marshall* (1990) 50 Cal.3d 907, 931, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 330, overruled on another ground by *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

To instruct the jury that Olmos was an accomplice if anyone committed the crime of murder, Ruiz requested CALJIC No. 3.16. To instruct the jury that Olmos was an accomplice if the crime of murder was committed, the prosecutor requested, and the court gave, CALCRIM No. 335. On the record and the argument here, the two instructions are fungible. We agree with the Attorney General that the doctrine of invited error precludes appellate review of Ruiz's argument.

Even so, in the interest of judicial efficiency, we address Ruiz's argument on the merits to preclude the need to adjudicate his alternative ineffective assistance of counsel claim. (Cf. *People v. Cooper* (1991) 53 Cal.3d 771, 831.) Ruiz argues that the problem with instructing the jury that Olmos was an accomplice was threefold. First, "labeling Olmos as an accomplice as a matter of law suggested he had to have been helping someone else," Ruiz argues, by identifying himself as "the only person he could have been helping." His argument is at odds with both the evidence and the prosecutor's theory of the case. Olmos admitted pulling Buford out of the car, leaving him beside the road, driving off in his car, and ditching his car. He admitted not cooperating with the police and only later pleading guilty to accessory after the fact and agreeing to testify. None of that evidence implicated Ruiz. Congruently, the prosecutor argued, "What's in dispute here and what you're here to decide basically is whether or not the defendant did it." Later, he emphasized, "Paul Olmos was a separate case. It had nothing to do with the charging of the defendant."

Second, "to the extent that the legal definition of 'accomplice' does encompass people who commit crimes by themselves," Ruiz argues, "the jury was never given the legal definition of accomplice, and thus had no reason to believe they had the authority to find Olmos, rather than Mr. Ruiz, was the shooter." His argument proves too much and too little. In argument to the jury, the instruction labeling Olmos as an accomplice served Ruiz well. "Mr. Olmos is an accomplice," his attorney observed. "He's an accomplice. In other words, someone that is involved here. And his testimony has to be looked at with caution." Additionally, the court *did* define accomplice for the jury. "A person is an

*accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant," the court instructed, noting two disjunctive scenarios, one of which was that a "person is subject to prosecution if he or she *committed the crime.*" (CALCRIM No. 3149, italics added, italics in original.) That the definition of accomplice appeared in the firearm discharge instruction, not the murder instruction, is immaterial since a gunshot wound was the indisputable cause of death. Jurors are presumed able to understand, correlate, and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Third, "because jurors learned that Olmos pled guilty to accessory after the fact," Ruiz argues, "they were led to believe that Olmos' role was not as the sole killer or one of two killers, but as someone who tried to cover up the real killer's complicity-again, leading to an inference that Mr. Ruiz was the one and only shooter." The prosecutor's theory of the case was quite the contrary. He asked the jury to decide which of two men, Ruiz or Olmos, both of whom were in the back seat of Buford's car, pulled the trigger. "What's in dispute here and what you're here to decide basically is whether or not the defendant did it." The definition of accomplice in CALCRIM No. 3149 authorized the jury to find Olmos pulled the trigger. With no evidence even suggesting he tried to help Ruiz, and with no instruction defining accessory after the fact, a reasonable jury was likely to infer simply that, in the absence of enough evidence to confidently take him to trial, the district attorney's office agreed to a negotiated plea.

The standard of review of an instruction challenged on due process grounds is whether there is a reasonable likelihood that the jury applied the instruction in a way that denied fundamental fairness. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 71-73 & fn. 3 (*McGuire* ); *People v. Clair* (1992) 2 Cal.4th 629, 663 (*Clair* ).) Our review of the instruction at issue, not " 'in artificial isolation' " but "in the context of the instructions as a whole and the trial record," satisfies us there is no reasonable likelihood that the jury did so. (*McGuire, supra,* at p. 72.)

(Resp't's Answer, Ex. A (footnotes omitted).)

1.   Procedural Default

Respondent argues that Petitioner has procedurally defaulted this claim.  Respondent notes that the state court ruled that Petitioner had invited the error of which he now complains, insofar as the defense requested accomplice instructions equivalent to the instructions he now challenges.  Respondent argues the Court is precluded from reviewing the merits of the claim. Respondent's argument is persuasive.

A federal court will not review a petitioner's claims if the state court has denied relief of those claims pursuant to a state law that is independent of federal law and adequate to support the judgment. Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30 (1989); See also, Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  A state court's refusal to hear the merits of a claim because of petitioner's failure to follow a state procedural rule is considered a denial of relief on independent and adequate state grounds.  Harris v. Reed,

1  489 U.S. 255, 260-61 (1989).  This doctrine of procedural default is based on the concerns of

2  comity and federalism. Coleman, 501 U.S. at 730-32.

3       As noted above, in this case the appellate court rejected the claim in accordance with the

4  "invited error" doctrine.  Under this doctrine, a petitioner is estopped from complaining of error

5  when he was at fault for inviting the error.  See People v. Marshall, 50 Cal.3d 907, 931 (1990),

6  quoting People v. Wickersham, 32 Cal.3d 307, 330 (1982), overruled on another ground by

7  People v. Barton,12 Cal.4th 186, 200-201 (1995) ("The doctrine of invited error is designed to

8  prevent an accused from gaining a reversal on appeal because of an error made by the trial court

9  at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be

10 heard to complain on appeal"); see also Coleman v. O'Leary, 845 F.2d 696, 699 (7th Cir.1988)

11 ("[F]irmly embedded in Supreme Court precedent is the doctrine that a federal habeas petitioner

12 who fails to comply with a state procedural rule, such as ... invited error, at trial, thus barring

13 state appellate court consideration of the merits of a criminal defendant's challenge to a state

14 court conviction, precludes federal habeas review of that claim absent a showing of cause for,

15 and prejudice resulting from, the procedural default").  The Ninth Circuit has determined that the

16 invited error doctrine is a proper basis for procedural default barring federal-court habeas relief

17 when the state court relies on that ground.  Leavitt v. Arave, 383 F.3d 809, 832-33 & n. 26 (9th

18 Cir.2004); Miller v. Oberhauser, 293 F.2d 29, 31 (9th Cir.1961) (rejecting a habeas petitioner's

19 challenge to a jury instruction on the ground that "Petitioner requested the instruction to which he

20 now objects").

21      Thus, "federal habeas review is barred unless the prisoner can demonstrate cause for the

22 procedural default and actual prejudice, or demonstrate that the failure to consider the claims will

23 result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir.

24 1993); Coleman, 501 U.S. at 750, 111 S.Ct. 2456; Park, 202 F.3d at 1150.  In this case, Petitioner

25 has not demonstrated any cause excusing the default or any prejudice resulting from the error.

26 Petitioner has also failed to demonstrate that a fundamental miscarriage of justice will occur if

27 the claim is barred from federal review.  The miscarriage of justice inquiry is governed by the

28 standard set forth in Murray v. Carrier, 477 U.S. 478 (1986). Murray requires a habeas petitioner

1  to show that "a constitutional violation has probably resulted in the conviction of one who is

2  actually innocent." Id. at 496. To satisfy Murray's "actual innocence" standard, a petitioner must

3  show that, in light of new evidence, it is more likely than not that no reasonable juror would have

4  found him guilty beyond a reasonable doubt. Id. Here, Petitioner makes no such showing of

5  actual innocence.

6      Accordingly, Petitioner is procedurally barred from bringing this claim.  Nevertheless, the

7  Court will also address the merits of the claim as it is plainly without merit.

8      2.  Review of Claim

9      The Supreme Court has held that the fact that an instruction was allegedly incorrect under

10  state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991), *citing*

11  Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not

12  permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary

13  rules").  Federal habeas courts therefore do not grant relief simply because an instruction may

14  have been deficient. Estelle, 502 U.S. at 72.  The only question is "whether the ailing instruction

15  by itself so infected the entire trial that the resulting conviction violates due process." Cupp v.

16  Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72; Henderson v. Kibbe, 431

17  U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be

18  established not merely that the instruction is undesirable, erroneous, or even "universally

19  condemned," but that it violated some [constitutional right]'").  "It is well established that the

20  instruction 'may not be judged in artificial isolation,' but must be considered in the context of the

21  instructions as a whole and the trial record." Estelle, 502 U.S. at 72, *quoting* Cupp v. Naughten,

22  supra, 414 U.S., at 147. In addition, in reviewing the instruction, the court must inquire "whether

23  there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that

24  violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990).  Even if constitutional

25  instructional error has occurred, the federal court must still determine whether Petitioner's

26  suffered actual prejudice, that is, whether the error "had substantial and injurious effect or

27  influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

28      In this case, the state court determined the instruction was correct under state law and did

not violate Petitioner's due process rights.  First, the state court reasonably rejected Petitioner's argument that the accomplice instruction necessarily implicated Petitioner.  The court noted that the evidence showed Olmos had pulled the victim out of the car, left him on the side of the road, and ditched the car.  He admitted he didn't cooperate at first with police and only later agreed to testify after he had pled guilty to accessory after the fact.  The court pointed out that none of this evidence implicated Petitioner.

Second, the state court also reasonably determined that the accomplice instruction did not preclude the jury from finding Olmos committed the murder rather than Petitioner. The court noted that the jury had been instructed with CALCRIM No. 3149 which provides that an accomplice is one who is subject to prosecution for the identical crime charged against the defendant.  CALCRIM No. 3149 further instructed that an accomplice can be subject to prosecution for the same crime if, *inter alia*, the individual did in fact commit the crime.  Jurors are presumed to follow their instructions. <u>Penry v. Johnson</u>, 532 U.S. 782, 799 (2001). Therefore, Petitioner fails to demonstrate that the jury was precluded from finding Olmos committed the murder.

Third, the state court rejected Petitioner's argument that the accomplice instruction led to the conclusion that Petitioner was the one and only killer and Olmos was only someone who covered up the killing.  As discussed by the appellate court, the prosecutor's theory of the case was quite different.  The prosecutor asked the jury to decide which individual seated in the back of the vehicle -Petitioner or Olmos- pulled the trigger and killed the victim.  There was no evidence that Olmos had tried to assist Petitioner.

Accordingly, Petitioner fails to show the instruction violated his due process rights, and that the instruction had a substantial or injurious effect on the verdict.  He fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence." The claim must be rejected. 28 U.S.C. § 2254(d).

C.  Special Instruction on Guilty Plea

Petitioner next claims the trial court erred when it denied the defense's special instruction

that Olmos' guilty plea should not be considered evidence of Petitioner's guilt.

This claim was also presented on direct appeal to the Fifth DCA where it was denied in a reasoned decision. (Resp't's Answer, Ex. A.)  Petitioner then presented it to the California Supreme Court where it was summarily denied.  (Lodged Docs., Order Denying Pet. for Review.) Accordingly, the Court must "look through" to the decision of the Fifth DCA.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA rejected the claim as follows:

> Ruiz argues that the court's refusal of a defense instruction barring the jury from considering as evidence against him a witness's guilty plea to the same incident was a prejudicial violation of his federal constitutional right to due process. The Attorney General argues that the instruction was not necessary and that error, if any, was harmless.
>
> The instruction at issue, Defendant's Special Instruction A44.5.1, provided: "The fact that a witness has entered a plea of guilty to charges arising from these events cannot be considered by you as evidence of the guilt of any other person." *People v. Young* (1978) 85 Cal.App.3d 594, the sole authority Ruiz cited in support of his proffer, held that informing the jury of the midtrial guilty plea of the codefendant charged as the gunman in a pair of robberies was "irrelevant to the jury's determination of guilt or innocence" but harmless beyond a reasonable doubt due to other evidence implicating the codefendant's aiders and abettors (one of whom was a driver, the other of whom was a lookout). (*Id.* at pp. 598-599, 601-603.)
>
> At the instruction settling conference, the court initially stated, "And I intend to give [Defendant's Special Instruction A44.5.1]," but the prosecutor represented, "Your Honor, this is given twice now," and the court refused the proffer. "The fact that he has pled shouldn't effect [*sic*] a defendant," Ruiz's attorney observed, but the court's ruling stood.
>
> On appeal, the Attorney General acknowledges the prosecutor's lack of specificity but notes the court's instruction with CALCRIM Nos. 226 ("Witnesses"), 316 ("Additional Instructions on Witness Credibility-Other Conduct") and 335 ("Accomplice Testimony: No Dispute Whether Witness Is Accomplice") and with Defendant's Special Instruction A44.31 ("Credibility of Plea Bargain Witness"). The Attorney General notes, too, that Olmos admitted in his testimony before the jury that he was on parole at the time of Buford's murder. Additionally, the court flagged his testimony alone for special scrutiny by giving an appropriately modified version of CALCRIM No. 301 ("Single Witness's Testimony").
>
> In the interest of judicial efficiency, we assume, without deciding, that the court's refusal of Ruiz's proffered instruction was a violation of his federal constitutional right to due process. The sole issue still before us, then, is whether he was prejudiced. We have already rejected his arguments that the jury's learning Olmos was an accomplice as a matter of law implied he was helping Ruiz, that the jury's learning he pled guilty to accessory after the fact implied Ruiz was the sole shooter, and that jurors had no way to decide Olmos, not Ruiz, was the shooter. (*Ante*, part 2.) Additionally, we take note of how, in argument to the jury, Ruiz's attorney meticulously savaged the "incredible" web of "lies" and "inconsistencies" that Olmos weaved in a desperate attempt to hide the fact that he, not Ruiz, murdered Buford.
>
> *Chapman* instructs us to consider "not what effect the constitutional error might

17

1
2
3

generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, citing *Chapman, supra,* 386 U.S. at p. 24.) Our review of the court's ruling, in the context of the instructions as a whole and the entire record before us, satisfies us beyond a reasonable doubt that there was no prejudice.

4     (Resp't's Answer, Ex. A (footnotes omitted).)

5     As a preliminary matter, the Court notes that any error in the state court's determination of

6     whether the instruction was necessary under state law cannot form the basis for federal habeas

7     relief. Estelle, 502 U.S. at 67-68. "'Failure to give [a jury] instruction which might be proper as

8     a matter of state law,' by itself, does not merit federal habeas relief." Menendez v. Terhune, 422

9     F.3d 1012, 1029, *quoting* Miller v. Stagner, 757 F.2d 988, 993 (9th Cir.1985).  Rather, a federal

10    habeas court must consider whether the omission of an instruction "'so infected the entire trial

11    that the resulting conviction violates due process.'" Henderson v. Kibbe, 431 U.S. 145, 154

12    (1977), *quoting* Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

13    Here, in the interest of judicial efficiency, the state court assumed without deciding that

14    the trial court's failure to instruct with the defense's special instruction was a violation of

15    Petitioner's due process rights.  The state court determined that, in any case, Petitioner was not

16    prejudiced.  The state court's finding was not unreasonable.  As previously discussed, there was

17    no evidence that Olmos intended to aid Petitioner.  And as discussed in Ground Two, *supra*, the

18    jury instructions could not have misled the jury into believing Olmos' status as an accomplice

19    meant he had helped Petitioner shoot the victim.  Further, the prosecutor's theory of guilt was

20    entirely at odds with this theory.  The prosecutor urged the jury to decide that Petitioner was the

21    killer and not Olmos.  On the other hand, the defense urged the jury to find that Olmos was the

22    actual killer.  The instructions and both theories of the case were totally inconsistent with

23    Petitioner's contention that the jury would have assumed Olmos was aiding Petitioner and that

24    Olmos' plea of guilty necessarily showed Petitioner was also guilty.  Petitioner fails to

25    demonstrate that the state court rejection of the claim was unreasonable.

26    Moreover, as correctly argued by Respondent, the inference that Petitioner argues

27    prejudiced him was a permissive inference, which allows, but does not require, the trier of fact to

28    credit or reject an inference based on an evidentiary or basic fact.  See Ulster County Court v.

18

1   Allen, 442 U.S. 140 (1979).  It does not operate to shift the burden of proof, and "it affects the

2   application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there

3   is no rational way the trier could make the connection permitted by the inference."  Id. at 157.

4   Here, as discussed above, the instructions would not have been construed as Petitioner claims.

5   Therefore, no Supreme Court precedent supports Petitioner's claim.  In any case, there is no

6   likelihood that the omission of the special instruction requested by Petitioner "so infected the

7   entire trial that the resulting conviction violates due process." Henderson, 431 U.S. at 154.  The

8   claim should be denied.

9        D.  Gang Evidence

10       In his next claim for relief, Petitioner argues the trial court committed prejudicial error by

11  admitting evidence that Petitioner was a gang member.  He asserts that the admission of gang

12  evidence was highly prejudicial and impermissibly lightened the prosecutor's burden of proof in

13  violation of his due process rights.

14       Petitioner first raised this claim on direct appeal before the Fifth DCA where it was

15  denied in a reasoned decision. (Resp't's Answer, Ex. A.)  He then presented it to the California

16  Supreme Court where it was summarily denied.  (Lodged Docs., Order Denying Pet. for Review.)

17  Therefore, this Court must "look through" to the decision of the Fifth DCA.  Ylst, 501 U.S. at

18  804-05 & n. 3.  The claim was denied as follows:

19            Ruiz argues that the admission of gang evidence was an abuse of discretion and a
          prejudicial violation of his federal constitutional right to due process. The Attorney
20        General argues that the evidence was relevant to show how an intra-gang murder without
          gang authorization affected perpetrators and witnesses alike.

21
          Before trial, the prosecutor filed a motion in limine to admit expert testimony
22        about the gang affiliations of Ruiz, Buford, and others and about additional aspects of
          gang sociology. At the hearing on the motion, Ruiz's attorney insisted that there was no
23        evidence of a gang connection to the murder and, while acknowledging that "an expert
          can testify to hearsay," emphasized that the law requires reliability. The prosecutor argued
24        that although Buford's murder was not "a gang related crime" all of the involved people
          were "documented gang members" so expert testimony was necessary. "Police
25        documentation in and of itself is not reliable evidence of gang association," Ruiz's
          attorney replied. Emphasizing the relevance of how one gang member could kill another
26        gang member, the court found the evidence "more probative than prejudicial" and granted
          the motion but expressed a willingness to give a limiting instruction to the jury "on the
27        expert's testimony regarding the hearsay" if the defense wanted one.

28            The gang expert testified about the gangs of Porterville and about the gang

19

affiliations of Ruiz and the others. He identified "three northern gangs"-the East Side Poros (ESP), the Varrio Central Poros (VCP), and the West Side Poros (WSP)-which, he testified, normally hung out together, partied together, and got along with each other, though not with their common rivals, which were "Sureño gangs" and "some white gangs." He testified that Rudy was an ESP member, Ruiz, Chavez, and Charles were VCP members, and Buford and Olmos were WSP members. Chavez, as the "channel" for all three gangs, had the duty to investigate people who cooperated with the police. Norteños are supposed to settle personal conflicts, but since Buford's murder involved "a northerner killing a northerner" the penalty was death, which "higher ups in Pelican Bay State Prison" impose on the person the investigation identifies as the killer. A northerner killing a northerner, the gang expert opined, is likely to call the channel and admit the crime.

Ruiz emphasizes the prosecutor's use of gang evidence in her argument to the jury. "The lifestyle of a gang member is a crazy one and it might be one that's hard to understand, and one that's hard for you to relate to, but it's one that's real and one that exists," she began. "Gang members live by their own set of rules and their own set of regulations and the moment that Rudy Jimenez, Michael Chavez and Paul Olmos cooperated with law enforcement they went against those rules and they put their life [*sic* ] in danger ." Ruiz characterizes the evidence that the court's ruling admitted as "nothing more than bad character evidence" that was not only "highly prejudicial" but also "unnecessary to prove any contested issue in the case." With commendable candor, he acknowledges, as the record shows, "there was not extended testimony about gangs," however.

In *People v. Cardenas* (1982) 31 Cal.3d 897, the primary authority on which Ruiz relies, our Supreme Court held that the admission of evidence that the defendant and his witnesses were members of a gang that commits criminal acts was an abuse of discretion due to the "real danger" that the jury would infer that he had a criminal disposition. (*Id.* at pp. 904-905.) Here, on the other hand, the gang expert's testimony did not show that Ruiz or any other VCP member, or even any member of either of Porterville's other two northern gangs, committed any gang crimes. Had the court not admitted the evidence, the jury might well have inferred that people feared Ruiz personally rather than the gang generally. Despite the court's willingness to give a limiting instruction, Ruiz cites to nothing in the record showing he ever requested one. Arguably he might have welcomed the somewhat confusing gang evidence to distract the jury from focusing on the rather straightforward evidence of his personal motive to avenge Buford's killing of his uncle years ago.

Evidence Code section 352 gives the trial court discretion to exclude otherwise relevant evidence if the prejudicial effect substantially outweighs the probative value. Our duty is to apply the deferential abuse of discretion standard of review. (*People v.. Kipp* (2001) 26 Cal.4th 1100, 1121.) The prejudice the statute seeks to avoid is not the damage to a defense that naturally flows from highly probative evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." (*People v. Farmer* (1989) 47 Cal.3d 888, 912, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) The gang evidence here did not prejudice Ruiz in that sense. Since we reject the statutory premise of his constitutional argument, his due process claim likewise fails. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3.) The essential question, of course, is "whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." (*Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 919.) The record answers that question in the negative.

(Resp't's Answer, Ex. A.)

The admissibility of evidence is generally an issue of state law which does not warrant habeas relief. Estelle, 502 U.S. at 67. "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9thCir.1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.1995), citing Estelle, 502 U.S. at 67-68.

As noted by Respondent, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009), the Ninth Circuit stated:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Given that there is no governing Supreme Court precedent, Petitioner cannot demonstrate that the state court denial of his claim was contrary to or involved an unreasonable application of Supreme Court precedent. The claim must be rejected.

Even assuming a constitutional violation occurred, Petitioner has failed to demonstrate that the admission of the evidence had a substantial and injurious effect on the verdict. Brecht, 507 U.S. at 637. First, the gang evidence was relevant since all participants and witnesses were gang members. As explained by the trial court, the gang evidence was necessary to explain how a gang member could kill another gang member, why Petitioner would report the murder to Michael Chavez, and why witnesses would fear for their safety should they cooperate with police. (RT 33, 42.) Petitioner fails to demonstrate that the rejection of the claim by the state court was contrary to or an unreasonable application of Supreme Court precedent. The claim should be rejected.

1     E.  Admission of Taped Statement

2     Petitioner claims the taped interview of Michael Chavez with police investigators was

3  inadmissible under the California Evidence Code.  Respondent argues that the claim fails to

4  present a cognizable federal ground for relief.  Respondent's argument is persuasive.

5     As previously stated, the admissibility of evidence is generally an issue of state law

6  which does not warrant habeas relief.  Estelle, 502 U.S. at 67. "The issue for us, always, is

7  whether the state proceedings satisfied due process; the presence or absence of a state law

8  violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th

9  Cir.1991). "The admission of evidence does not provide a basis for habeas relief unless it

10  rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d

11  926, 930 (9th Cir.1995), citing Estelle, 502 U.S. at 67-68.

12     In this case, Petitioner does not cite to any federal authority for his claim.  He merely

13  alleges, as he did in state court, that the admission of the taped interview violated the California

14  Evidence Code.  Therefore, no federal question is presented.  Even if Petitioner were to amend

15  and present a federal claim, it would be unexhausted.  Finally, any federal claim would be

16  meritless as there is no Supreme Court authority which established that the admission of a prior

17  inconsistent statement to impeach a witness violates the Constitution.  See Holley, 568 F.3d at

18  1101.

19     F.  Cumulative Error

20     In his final claim for relief, Petitioner alleges the trial was rendered fundamentally unfair

21  due to cumulative error.

22     A defendant may prove that he has suffered prejudice based on the cumulative effect of

23  errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether

24  exculpatory evidence suppressed by state is sufficiently material to violate Due Process Clause,

25  court is required to assess "cumulative" or "net" effect of all suppressed evidence and commits

26  legal error if it only conducts piecemeal analysis of each item of suppressed evidence); O'Neal v.

27  McAninch, 513 U.S. 432, 435-36 (1995) (accepting lower court's assumption that "confusion

28  arising out of a trial court instruction about the state of mind necessary for conviction combined

with a related statement by a prosecutor" required habeas corpus relief if "combined" error was not harmless); <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the extent that his conviction must be overturned"); <u>Cooper v. Fitzharris</u>, 586 F.2d 1325, 1333 (9th Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*, 440 U.S. 974 (1979).

In this case, however, none of the claims raised by Petitioner have merit.  Accordingly, Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because there are no errors affecting the verdict to accumulate. <u>United States v. Jeremiah</u>, 493 F.3d 1042, 1047 (9th Cir.2007).  The claim should be rejected.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   November 19, 2012**            **/s/ Barbara A. McAuliffe**
UNITED STATES MAGISTRATE JUDGE